Thank you, Your Honor. Judge Gould, before our official 15 minutes starts, can I take 30 seconds to clarify, not more argument, but just how my co-counsel and I, Ms. Rowe, are going to divide up today's argument between the two of us so there isn't confusion about that. Would that be all right? That's an excellent idea. Please proceed. Thank you, Your Honor. So on our side of the case, you have two sets of appellants and two sets of plaintiffs. You have the Marcus & Millichap companies. I represent them. And you have five individual plaintiffs. They're represented by Ms. Rowe. And the way we'll divide up today's argument is that I'll take a lion's share of the argument because Marcus & Millichap's position essentially encompasses that of the individual plaintiffs were aligned in all respects, all the arguments that the individual plaintiffs make, Marcus & Millichap makes as well, and Marcus & Millichap has one additional argument. And so I'll do my best to cover the waterfront. And in the event that the court has an issue with something that requires the attention of Ms. Rowe, in particular to the individual plaintiffs, she'll be prepared on deck to step in either at the end of this segment of the argument or the part of our rebuttal. But you'll be here mostly for me. So that's how we'd like to handle the case today. And we appreciate the court's indulgence as we try to pass the baton as smoothly as possible. Yes, that sounds like a good plan. So please proceed. Thank you, Your Honor. Very well. May it please the court. The district court's judgment in this case needs to be reversed and the opinion doing so will have two major components. The first component will address standing and the second component will address the merits of the Dormant Commerce Clause analysis. Now, our submission is that on standing, the district court committed two serious errors. It committed an error as to who can sue. It was wrong to exclude Marcus & Millichap from the case entirely. And it also committed a standing error about what issues are at hand. It was wrong to exclude the issue of the in-state presence requirement. And so our submission is that once those standing errors are corrected, the court should then look at the merits of the Dormant Commerce Clause analysis as we presented them originally below and as we present them primarily here, accounting for all of the parties and all of the arguments. Mr. Forrest, I'm sorry to interrupt your rhythm, but we did submit a notice that we were going to ask about the younger abstention. And so I wonder if you could start with that, if you don't mind. I'm curious if the state proceedings are still ongoing and can you let me know what the status is right now of that? I can, Your Honor. I can give you essentially four sets of answers to the abstention inquiry. So let me try to take them in order and let me know if I missed something. First, I want to give the court two important citations to the district court proceedings. The citations you'll need are documents 85 and document 124. The issue of younger abstention arose in the district court. The defendants below asked for younger abstention there and we briefed the issue in full. And so all of the citations and arguments I'm about to give you are in documents 85 and 124. And that Yeah, I'm sorry. Did the district court rule on this? It did, Your Honor. If you want to see the ruling on this, the ruling occurs in two places. You can see it in document 32. That's a minute entry. And then you can see it in document 156. That's the transcript of the hearing. In document 156, the ruling is at page 34. What is the ruling? The ruling is that the district court did not abstain. The district court chose to exercise jurisdiction for the reasons that I'm about to give. The main reason is the timing rule that we have from the nationwide case. The timing rule in the nationwide case is that whenever a younger abstention issue arises, courts evaluate how far along the federal case is. And the key phrase is embryonic. If the federal case is at its embryonic stage, which is to say before any proceedings of substance has occurred, then if the younger abstention requirements are met, abstention might be appropriate. But if the federal case is beyond the embryonic stage, which is to say if any proceedings of substance on the merits have occurred, then even if the younger abstention requirements are satisfied, younger abstention still is not appropriate. And so that was one of the leading arguments we gave below. And that's the argument that the district court accepted. And so it was true when we argued younger abstention at the district court that we were far past the embryonic stage. And it's very much true now, of course, at the podium and the Ninth Circuit that we're beyond that stage. So that's the timing rule that I have to give. The question is, Flores, has the Appellee Cross appealed the ruling on younger? They have not, Your Honor. And so that's one of the procedural barriers we would have. And I'll give the court just a taste of the substantive reasons why younger abstention doesn't apply. These are in those citations that I gave you. I think there are four. Number one is that in order for younger abstention to apply, you would need proceedings below that are of a judicial nature. And the only substantial proceedings that occurred here were administrative proceedings. Reason number two is that the underlying proceedings need to be criminal or quasi-criminal in nature. And these underlying proceedings are entirely civil. Reason number three is a party identity problem. The only parties to the administrative proceedings at issue here are the individual plaintiffs. But my clients, the Marcus and Millichap companies, are not parties to those proceedings. And the fourth reason is that there is an exception to the younger abstention doctrine for cases of irreparable harm. And this is such a case. Recall that the rights we're asserting here are constitutional rights to be free of laws that violate the Dormant Commerce Clause. And the loss of those rights is irreparable. So those are four reasons that on the sort of substance of the question, aside from timing, younger abstention shouldn't apply. And as Judge Bea indicated, there's also something of a procedural problem. The appellees didn't cross appeal. And our position is that the younger abstention doctrine is not a function of the Article III case or controversy requirement. So the court doesn't have to reach it. We think it belongs to a party. It's a comedy-based doctrine. And if the state to whom comedy might be owed has no problem with this case as they don't, the court doesn't have to reach it on its own. Okay. Thank you. Thank you, Your Honor. So with that out of the way, we'd like to address the standing issues as quickly as we can. There are two critical errors. One is about who can sue. And one is about what issues are in the case. And we think both of the standing errors arose from the same misconception. And that was the district court and the defendants below focused too much on one part of the analysis. And that was the actual administrative enforcement proceedings that took place during the pendency of this litigation. Now, those actual enforcement proceedings are a point in our favor on standing, most certainly. But they are not necessary to establish standing. They're not even the most important part of the standing argument. Recall that this case, the theory of the case, is for prospective relief. We seek declaratory relief and injunctive relief in the future. And under the Supreme Court decisions like Susan B. Anthony lists, we can set that up in standing, not just in one way, but in three ways. And we did all three here. The first way we did so is we showed express threats of enforcement. The second way we did so is to show the actual acts of enforcement that occurred during the pendency of this litigation. And the third way, last but not least, is that we showed the clear face of the lawsuit issue imposed the prescription. And the district court focused only on that second piece of the analysis. And we think it was wrong on those terms, but the court doesn't even have to get there because both Marcus and Milosevic and the individual plaintiffs established a full-fledged case of standing with both of the other showmen. I would like to follow up, maybe break this down a little bit because I'm trying to see how you have standing to challenge either of the provisions at issue here. And I want to focus on the cooperative certificate, brokering certificate. It seems like at the time that you filed this lawsuit, the individual plaintiffs had never even applied for a certificate. It seems like they were placed in the disciplinary proceedings, were conducting real estate business without a license or certificate in the state, which is another, a completely separate provision or for assisting others in doing so. So I'm trying to have standing to challenge a provision that limits the use of a certificate when they never even applied for the certificate in the first place. So the answer, your honor, is that if they had applied, it would have been futile because the face of the law clearly prohibits what we try to do. That's the rule we see in this court's decision in the desert outdoor decision. And you can see the same thing out in the nationwide decision. If the face of the law says, we're going to give you a license or a cooperative certificate, but only for some small set of transactions, or if it attaches conditions like an in-state presence requirement, the rule is that plaintiffs don't have to run headlong into that law and violate it just to challenge it in court. If it's as clear as it is here, there's no need to do that. The peculiar rule solves that problem. Well, that's a simple. It seems like your injury here is self-created and kind of speculative because if the individual plaintiffs were never disciplined for violating the certificate provision, which limits the use of the certificate, you know, and they were disciplined for conducting business without a license or certificate, and they could apply for it, and it's possible they could apply for a license. I'm not sure why you've shown that you have an injury here. The injury, Your Honor, is that there is no license that we could apply for that would let us engage in the conduct we're suing for. And there is no cooperative certificate that we could apply for that would let any of these people engage in the activity that we're suing for. Remember, standing should be focused on the conduct at issue and not the legal reasoning that the state gives to punish it. Our theory of the case is simple. We want to engage in cooperative brokering, and we think that the state should be able to punish us under the current regime because the current regime is unconstitutionally restrictive. The whole point of the case... But if that's true, I mean, it seems like even if the cooperative brokering certificate somewhat limits, you know, an out-of-state broker's ability to conduct business in the state of Nevada, all of these individuals could simply obtain a license in Nevada. Why doesn't that affect the outcome here? Your Honor, they could obtain the license, but they can't use it because of the in-state presence requirement. Let me maybe state the point this way. The state of Nevada is required to give a constitutionally adequate means of access to this market, and there are two ways that apparently exist. One is the license. One is the cooperative certificate, but both of them are constitutionally invalid. The license method is unconstitutional because it has the in-state presence requirement. But all the plaintiffs are affiliated with MNM, which has a Nevada office. That's true, Your Honor, but the law that the defendants impose requires the individual brokers and individual agents to be practicing under either a license or a cooperative certificate. The fact that Marcus Emilichap has an office there doesn't solve the problem. If counsel for the other side wants to change positions now, they can, but we've been through four years of this litigation, and never once have they taken the position that we can do what we'd like to do under the current regime. Their position consistently has been we can't do cooperative brokering with a license because of the in-state presence requirement, and we can't do what we want to do with the cooperative certificate because it bans the use of a cooperative certificate in virtually all transactions. The whole point of the case is that they're not making something available that would let us go do the cooperative brokering that we'd like to. This runs straight into the futility rule. You can see the very same thing play out in Nationwide. So there, there was a licensing requirement. The licensing requirement imposed an in-state presence element, and in Nationwide, the plaintiff, just like us, didn't go ask for a license and was denied. They didn't get a license and exceed the limitations of the license. They just got punished by the state for engaging in unlicensed activity. The parallel is exact, and the same rule applies here. Another facet of this argument, of course, is the rule that in 1983 cases, plaintiffs don't have to exhaust local remedies, and so once the defendants here enacted this unconstitutional set of laws, the onus is not on us to go ask them if they really mean it, especially when the laws are so perfectly clear on their face. Mr. Flores, can I ask you a Do you concede that the state of Nevada could require any real estate broker that transacts business in the state of Nevada to be licensed and get rid of the cooperative certificate completely? There is a version of some licensing requirement, but we would need to see the exact contours. So if it were this license requirement because of its in-state presence element, then the answer is no. The in-state presence element is not facially discriminatory as to out-of-state brokers. The in-state presence requirement is asked to Nevada brokers as well as to Ohio brokers and New York brokers, right? What you said is true. The in-state presence requirement applies to everyone, but that was exactly the same thing that was true in Granholm, and that was exactly the same thing that was true in Nationwide. The whole point is that by definition, a broker who's not already in Nevada has to come to Nevada. They have to erect their place of business there and do business from that place. The same thing was true in Granholm. The same thing was true in Nationwide. This is the heartland example of an in-state presence requirement. It's not that once we get the license, we can't do anything with it unless we physically come to the state of Nevada, and that's precisely the violation that we're looking at. Now, the state could construe... Thank you, Your Honor. That does bring up an important point. Our position is not that these brokers and agents should be able to practice without any regulation, and there are two important points of this. Number one is that this case has nothing to do with the separate laws about actual misconduct, laws like fraud and misrepresentation. Those were perfectly enforceable before this case, and they'll be perfectly enforceable after this case, no matter what. This case is only about the licensing regime, and it's only about this economic battle of who can come into the market and not, and so that's a critical distinction to make. More importantly, our position is not that the state can't come up with some licensing regime or some cooperative certificate requirement. Indeed, Marcus and Milachap works with states around the country to comply with things that are like the cooperative certificate, but in those cases, the cooperative certificate regime is constitutionally open. It allows a minimum amount of business and isn't burdened like this one is. An example that we can refer to is the Kentucky cases. That's where we have what are called turf state laws again, and there in the Kentucky cases, Marcus and Milachap had to litigate. We went down this same road and showed there are easy alternatives. If we get down to the less restrictive alternative part of the analysis, there's an easy way to solve this problem. It's not that any cooperative certificate and any license is wrong. It's that this cooperative certificate and this license is wrong. In the little time that I have remaining, let me say this, the one thing we've never heard an answer to from the state is why they allow cooperative certificates to be used for some kinds of transactions and not others, and I think that's the critical part of the case that's never been answered, and if they have an answer, we should hear it today. Unless the court has any further questions, we'll yield our time. Thank you. Ms. Rowe, can I hear from you? I appreciate the time, and I will try to keep it short. I may have to use the court. I do represent the individual plaintiffs and not the companies. Those are the commercial real estate brokers here who were disciplined for doing nothing more than what their national investor or client wanted them to do, and one of the key points in the record is that in the state of Nevada, 70 percent of commercial real estate transactions involve either an out-of-state buyer or an out-of-state seller, so we know that this is an inherently national market for which supply and demand require robust cross-state marketing and national expertise, and according to the state of Nevada, out-of-state investors, California, New York, Texas, they can use their trusted broker to buy a property in Nevada so long as they're working aside of Nevada licensees, but then Nevada says before warrant out-of-state buyer, if you do buy a property with your trusted broker and the local licensee, you're not going to be able to sell it with those same people. You're going to have to switch horses, and you're going to have to use exclusively local brokers. You're going to have to give up your trusted relationship. You're going to have to give up your national chosen broker's expertise in order to sell it. That, I think, to Judge Baya's question, leads right into, well, what if the state, all the state of Nevada were doing here were to require a license, and the one problem with that is the in-state presence requirement, but I would go a step further and say even if there were no in-state presence requirement and even if we were only talking about no cooperative certificates, just a license, you'd still have to look at the pipe balancing test because this absolutely affects a national market. This isn't like a dentist or a hairstylist. This is more like the regular stock market. In the stock market, if you told somebody you can buy stock in a Nevada company using your trusted stock broker, but you're not going to be able to sell that same stock with your same trusted stock broker, we would know that there was an inherent commerce clause problem there, and so you have to look under that. Ms. Rowe, why isn't this situation more analogous to the situation of practicing law in the state? Certainly, the state could say nobody who's not a member of the Bar Association can represent parties in our courts, right? So why is it like that? Thank you, Your Honor. Two answers to that. One, to my knowledge, all courts do allow a ProHop Veche-type system, and that's what we're asking for here in this system. We're not asking for Marcus and Milichap to be able to, out-of-state brokers, to go in on their own and conduct transactions. We're asking for them to be able to engage in a ProHop Veche-type situation where they can get the expertise of the local broker who vouches for them, is responsible for all of the local issues, just like happens in court. The second response I would have to your question, Judge Bea, is that the commercial real estate market is actually much more inherently national than the legal market. One of the examples in the paper that is quite typical of Marcus and Milichap clients is a client who owned 102 Red Lobster restaurants in 25 different states, and they wanted to sell those, and they wanted their broker, their trusted broker who has helped them over the years, to help them sell all of those 102 properties in all 25 states. According to the state of Nevada, that broker can do 101 of those properties, but for the 102nd property, the one in Nevada, that broker has to step out, can't market it, can't put its name on the advertisement in the New York Times. It's got to turn it over exclusively to a local broker that the client has never met. So that's not what happens in the legal context. I think the ProHop is a good example, but I think the interstate commerce burdens on commercial real estate are much more significant because of the cross-state nature of commercial real estate investment. The burdens of that type of marketing here, if we are down to pipe balancing, if you forego the Scripps scrutiny, which I think in our papers is very well described why Scripps scrutiny should apply, but if you do, you'll look at what are the burdens. This market hurts the out-of-state brokers who want to compete on the basis of their national expertise, their national client base. It hurts the out-of-state investors who are being told they can't use their trusted broker in order to sell the property. It hurts in-state property owners due to the depressing effect of decreasing the supply and demand and through the depressing effect of the national marketing. And the only group that it actually helps are those particular local Nevada brokers who choose not to participate on the national level. Any Nevada broker can always develop this expertise themselves. They can always work with an out-of-state broker on these types of cooperative transactions. So the only one that's actually helping are the Nevada brokers who don't have those national connections and that national expertise, and we think that violates the Dormant Commerce Clause. Okay, thank you, counsel. Thank you. Judge Gould, I wanted to ask the clerk a question. I thought we initially set this for 10 minutes of Mr. Florence and five minutes for Ms. Rowe. Is that correct? Hi, Judge. This is Olivia. I'm the clerk. I'm sorry. I had it set to 15 minutes instead of some extra time, but we gave Ms. Rowe approximately the five minutes she was planning on. That is correct. Thank you, Your Honor. So I think we're fine. And we'll now hear from the judge. Good afternoon, Your Honors. Heidi Stern on behalf of the appellees. I'll go ahead and start by talking about the abstention doctrine, since that's what Judge Murguia had first asked about of the appellants. And while we did not cross appeal on that issue, I do want to let the court know that there are current proceedings that were pending and actually still are pending, although they're stayed, in the district court, the First Judicial District of Nevada. And they have actually been stayed and then remanded to the commission in order to decide the very issues that are before this court today, the constitutionality and validity of the certificate and licensing requirements. Why didn't you cross appeal, Ms. Stern? Well, I was not on the case at that time, but I think that we just decided that we had a winning case. That's the best I can answer. But is it possible that we would do something inconsistent with the state proceedings? Do you know if the constitutional issue is being raised there? Oh, yes, it is. The exact issue is pending. There's a hearing scheduled for the end of July. Okay. So I'm perplexed. So is it possible? Did you waive it then? Or is that a jurisdiction issue that we have? I don't think we have to raise it on cross appeal in order for this court to decide the issue sua sponte because it is entirely within the court's discretion to rule on abstention or to decline to rule in the case. I'll say this. What I don't know is if at the time this appeal was taken, whether those issues were pending at that time. I don't know. I know they're pending now and they've been remanded to the commission by the Nevada State Court, but I do not know what the status was at the time of the appeal. So I couldn't find the sites that Mr. Flores said. I don't see where there's talk about the abstention doctrine, but I need to look. It was addressed in the summary judgment motions by both parties. I'll say we didn't make a huge, it was after the Owen case came down, the nationwide versus Owen. The district court, I believe, had asked us to address the implications of that case, both for the does not appear in a written decision from the district court. As Mr. Flores said, it was an oral ruling where the court just decided he was going to go ahead and rule on the merits. So I'll just quickly take you through the abstention requirements that this court established in Owen, which is that the case is ongoing, which it is. I would argue that this is quite similar to the administrative action that was taken there and it was taken to the first official district court of Nevada. It does implicate an important state interest and the federal challenges with the constitutional challenges have been raised. Why is it quasi-criminal? Why could it be considered quasi-criminal? I would say because there are penalties. It's certainly not criminal. It's a civil enforcement proceeding, but there are investigators, investigations, evidences brought as in the criminal proceeding, and then ultimately there are penalties that will apply at the end. Civil penalties, correct? Yes. Can't put someone in jail for it. No, no. Certainly not. So the question is whether it's quasi-criminal or is it judicial or state proceeding? What's the other requirement? Sure, that it's ongoing is number one, quasi-criminal is number two. The third is an important state interest and the fourth is that in the proceeding, the litigants are able to raise federal challenges. So it does, I think, technically meet all of those, but again, I would say it's up to this court's discretion and I'm happy to address the merits. And counsel, you think that even though there was no notice of appeal, we have discretion to address the issue? I do, Your Honor. Okay. And I'm not sure it was briefed by all the parties, so I'm just wondering. It was not briefed. I'm wondering out loud if it would make sense if the panel thinks it's pertinent for us to ask all counsel to submit supplemental briefs on the issue indicating whether we have the power sui sponte to raise it, then what the results should be. I'd be happy to do that briefing if the court would like. Okay. Should I await an order or should I plan on that? Well, I'm just one judge, so wait for an order of the panel. Mr. Flores and Ms. Froh, what do each of you think about whether we should allow supplemental briefing on the Younger issue as to whether we have... Sorry, Judge Gould, I think you're cutting out. Okay, well, wait. It looks like it's on here. Okay. Can you hear me now? No. Okay, I'll try to speak as distinctly as I can. I'll ask Ms. Froh and Mr. Flores if we should get supplemental briefing. Your Honor, we'd be happy to supply that. We have no problem doing so. I agree. Okay, thank you. Again, wait to hear from the panel, see if it wants it. So why don't we let Ms. Stern proceed. Thank you, Your Honor. So aside from abstention, should this court decide to hear this case, it should affirm the district court's decision. First off, the district court properly limited standing in this case to essentially the individual plaintiffs being able to challenge the licensing and certificate restrictions of the Nevada statutes. And that was based on a careful analysis considering injury causation and regressibility, noting that there was no injury to the entities. And even if there was an injury to the entities, any injury to them was not actually caused by the things that they're complaining about. As this court has noted, there are actually two offices of Marcus and Millichap in Nevada, so no one ever complained about the physical office location requirement, nor would that requirement bar in any way any of the plaintiffs, entity, or individual from conducting brokering activities in the state. It limits them in essentially no way at all. Also, the certificate is designed, and here's one thing that I think that appellants have misconstrued. The idea of the licensing statutes that Nevada has propounded are essentially to require licenses so that the Nevada Real Estate Commission and Division can oversee those and protect consumers and prevent fraud, and basically just keep the profession professional, essentially. May I ask you a question there, because something has bothered me throughout this case. You have an exception, which is a cooperative certificate for out-of-state brokers representing out-of-state buyers. They can have a cooperative Nevada agent in the transaction. That seems to be okay with the Nevada Commission as to the interest of protection of the parties who are in transaction as to Nevada Real Estate. Why is that not also true for out-of-state brokers who want to represent Nevada sellers as well as buyers and Nevada buyers? You see, I don't see that there's any more protection that the sellers in Nevada have to have or the Nevada residents have to have or the Nevada buyers have to have than the Nevada sellers when you allow an out-of-state broker to come in through a cooperative certificate. As I see it, and this may be broad brush, but it seems to me that what the Commission is doing is allowing out-of-state brokers who are spending a great deal of money in the nationwide market to bring buyers into Nevada, but the Commission is sort of sitting on the prime, juicy part of the transaction and saying sellers can't use out-of-state brokers. They get the whole real estate license. So, I don't see that there's a real protection that is afforded on the sellers in Nevada. They couldn't be accomplished by a long cooperative certificate for sellers, Nevada residents, and Nevada buyers. That's probably such a long-distance and long-winded question. Can you indulge me in a long-winded answer? Because I have several things to say about your question. The first is that the purpose of the certificate was not to protect sellers. It was to expand the market. So, that regulation was passed in 1981, and for those of you who know the history of Nevada, you know that in 1981, it was a very small state, very much trying to develop itself, and so the idea was prior to that, basically, they only allowed people with licenses, essentially. And so, in an effort to expand the economy and welcome outsiders in, the cooperative certificate was passed. And I don't know for sure. I don't have legislative history on this regulation, but I think the logical assumption is that they were specifically looking to bring in people to buy real estate and invest. Who wanted to represent sellers then? I think that they wanted outside investors, and they didn't so much care about people selling the property because most of them were probably Nevada citizens. I'm sort of speculating in sellers can't use the cooperative certificate. So, you're expanding one little section of the market, not little section, but one section of the market under the idea of expanding the market, but not allowing expansion of the market, which is the goal of the Nevada state legislation, as to the other segment, the other transactions. It seems, pardon me, a little fishy to me. And I think that if Marcus and Milosev actually had a problem with that, what they should do is go to the legislature. It's just not a dormant commerce clause violation. Good luck. That's the bottom line. It's not a dormant commerce clause violation. Could Nevada have done that? Yes. But let me point this court to the North Carolina case of FURD. And if you'll excuse me Marcus and Milosev versus Skeeter's case from West Virginia that they cite as supporting them. But in fact, that Kentucky court, it involved a different type of statute and regulation than Nevada's, but they cited approvingly a North Carolina regulation that is very similar to that of Nevada. And the North Carolina court said, when as happens with increasing frequency in our state, the buyer is an out-of-state investor with complex interests and concerns best known to its regular brokers in its home state. The interests of the parties are better served if the out-of-state party is allowed to rely on the combined efforts of an in-state broker and an outside broker. In such an arrangement, the North Carolina licensed broker is legally responsible for cooperating with the out-of-state broker. And such an arrangement seems to be clearly in line with the legislative intent. And they cited it as something that was constitutional. The Kentucky court said, while our statute may not be constitutional, North Carolina's is and here's how it's structured. So I point that out mostly to point out that we're not the only state that made that decision. And you referenced it as fishy. And I would say that many states make that decision because they're looking to expand. They're not actually discriminating against the out-of-state. They're trying to expand their licensing to allow some out-of-state limited, some limited out-of-state investment. And then the second part of my answer to your real estate division in Nevada wants to be very careful about how far it expands the opportunity for out-of-state brokers to come into the state. And that is because its job is to protect Nevadans, Nevada citizens, and to control what's going on with the real property. If it expands that too far, the burden on the state to enforce those provisions becomes absolutely impossible. Trying to track down people who have violated Nevada law or regulations, who have no state presence and are representing someone out of state, it just becomes too much. And so they limited it for that reason. But in the cooperative certificate, you always have a Nevada broker who's responsible, right? That's true. Yes, that's true. There you are. I only answer that the legislature has that capacity and it doesn't affect its constitutionality. Here's a question, perhaps put in a different way. Is the fact that Nevada has opened up a portion of its real estate market to out-of-state brokers, does that require it to open up the rest of its transactions to out-of-state buyers? That's what's called a favorable question to you. No, it does not. And I'll just thank you, Your Honor, for the softball. It does not. But I would like to take the court back to the Pike analysis, because I think that's where we really reach the result that is correct in this case. And that's what the district court did, which was on its face, are these licensing requirements even handed? Do they treat anyone special? Well, in this case, the certificate actually treats the out-of-state broker special, because it allows it to come in without getting a license, without taking on those responsibilities. So what Marcus and Milichap is actually asking for here is that it be even more special. Not that it be treated fairly, but that it be given benefits that don't accrue to in-state licensed real estate brokers, or even out-of-state licensed real estate brokers. Can I ask you a question regarding this Pike analysis that you raised? The plaintiffs make an argument in their brief that you don't quite address. They argue that if the Pike balancing analysis applies or test applies, even if that Pike analysis test applied, you offer no evidence that the licensing scheme serves some legitimate local interest or offers local benefits, which I think you're required to in the context of summary judgment. So can you point to any evidence in the record that supports the finding that the cooperative brokering provision offers local benefits? I think that the way that we did address that is to cite the statutes of what the goal and purpose of the real estate division is, and that was to establish the legitimate interest. So the Nevada real estate division has a legitimate interest in protecting consumers. The commission has a legitimate interest in making sure that its ethics and standards are upheld by the brokers themselves. And at that point, once we've established that, I would argue with the is once you have that legitimate interest and once you've established that it's even-handed, and that's all facial, that's all on the words of the statute, the appellant would then be required. Marcus and Milicek would then be required to show that it causes a clearly excessive burden on interstate commerce. When they fail to meet that requirement is when the district court is able to grant summary judgment in our favor. There was no requirement that we establish clearly excessive burden or that we even rebut it when they failed to establish that. Okay, counsel. I think I've let you go over your time. I appreciate that. I'll just ask, we'll thank the appellees for their argument. And then the appellants used up their time. But as I said, these are special times. So I'll just say that if Mr. Flores or Ms. Rowe need a minute or two for rebuttal, you can have it. Mr. Flores. I'll defer to Ms. Rowe to go first if she has something, and then I'll follow up on the end, Your Honor. Thank you. All right. It seems like she does not. So I have three brief points to make. One is about standing. The rule of law out of Susan B. Anthony list is that standing does not require past injuries. We do not have to show that our plaintiffs were actually injured in the past. All we have to show is that if we engage in the conduct we're talking about, cooperative brokering, the defendants are going to say that it's illegal. And they just spent 15 minutes saying it's illegal and trying to explain why that's a good idea. Standing has been purpose and proof. The counsel on the other side said that this law was enacted for a good and legitimate purpose. That is wrong. We caught the defendants red-handed. You can see evidence of why the cooperative use restriction was enacted. It's in the record at ER 690, 736, 712, and 723. The people that enacted this regulation, these citations are in the briefs. They literally said they're enacting the regulation because, quote, taking business away from our Nevada licensees. They literally enacted the regulation because, quote, business being taken away from Nevada licensees. We caught them red-handed explaining what the purpose is, and there is no evidence supporting the purpose argument you heard from my friend on the other side. The other merits argument I have is about proof. Proof is absolutely required. To carry the summary judgment burden under the Dormant Commerce Clause, the state absolutely has to prove up the pike balancing test. This is not rational basis. You can see a litany of citations. We give you the Supreme Court's decision in the Piper case. We give you the Supreme Court's decision in the Frazier case. The amicus brief from the Texas Public Policy Foundation speaks to this point exactly, that they have to actually show hard physical proof of how the pike balancing test weighs out in their favor. They can't assume that there's a need for a regulation, and they can't assume that this way of regulation is going to succeed. The last thing I'll close is that we still don't have an answer to why they allow it for some transactions and why they allow it for others. This is the hallmark of arbitrary action that violates the Dormant Commerce Clause under any level of scrutiny. Thank you, Ron. Thank you, counsel. Unless Judge Bea, Judge Meek, Markia, have further questions? No questions. Okay. I'm going to thank Mr. Flores, Ms. Rowe, and Ms. Stern for your excellent arguments. It's a very interesting case, and the panel will submit it now, take it under advisement. If we want to get more briefing on the Younger issue or any other issue, you'll hear from us. Thank you, Ron. Okay, thank you. This is now submitted.
judges: Gould, Bea, Murguia